Good morning. Good morning, Your Honors. My name is Byron Ball, V-A-L-L, and I represent the Appellant's Plastic-View in this matter. I would like to reserve just a couple of minutes, I think, just to highlight some of the facts and the chronology, just to give some context. Appellant Plastic-View, A-T-C, is Plastic-View Air Traffic Control. That was a brainchild of Mr. Sonny Voges, who served our country in World War II. And during the time he was serving our country, he realized that there was too much glare on these air traffic control towers. So when he got out of World War II, he started doing business with Eastman predecessors and interests to develop this window shade. That turned into a second and third generation of business with the Voges family, where they did window film. So Plastic-View International is window film. Plastic-View A-T-C is shade. That was really the brainchild of Sonny, who recently passed away. This isn't really to provide a lot of emotion to the argument. It's more to highlight or disabuse the court of the notion that Eastman's raised, that these e-mails that constitute contracts are run-of-the-mill sales activity. If there is a contract in this case, as you contend, what is it? What are its terms? Yes, Your Honor. I'd like to direct the Court's attention to Appellant's Excerpts of Record, page 17. And I won't read everything. I'll just read the relevant. It goes to the heart of the agreement. And it starts really at page 16, paragraph 32, the first cause of action for breach of contract. And there's an exchange of e-mails between Mr. Gershenson of Eastman and Mr. Voges of PVI, who's here with us today. What paragraph are you reading? It's paragraph 32 at page 16 of the second amended complaint. So we're at page 16 of our Excerpts of Record, reading from paragraph 32. And I won't read all of it. I'll read simply from paragraph 32, line 25, to the conclusion of. . . Well, we have it in front of us. Okay. You don't have to read it to us. Tell me what the terms of the contract were. How much did they agree to sell to your client at what price? Okay. Yes, sir. The e-mail specifically states that the products that will be offered, and this is at paragraph line 4, the attached list of automotive films contain 85 products. . . That we will offer, correct? That we will offer. So your position is that they thereby agreed to sell those to your client. Yes, Your Honor. At what price? The price list is contained in additional e-mails that are attached. Right. There's a subsequent price list. Yes, sir. And how many? As many as you wanted? Yes. And that's where the business. . . So tell me where that term comes from. That term comes from the amended complaint. . . No, it's what you allege. Tell me what evidence there is that they agreed to sell a certain quantity of window product to your client, and also what evidence there is what the duration of that obligation was. Okay. The duration of the obligation, again, there's so many different mini-contracts. The way it really went down is there would be purchase orders and invoices and a 30-year history. So they agreed forever to fill orders from your client? One set of orders? Three set of orders? How many? I don't believe that the duration was forever. I think that would be an unreasonable position to take. So what is your position? The position is that since they've been doing business for 30 years on the film, when they're making an offer to provide 86 products and containing a price list, and that offer is accepted based upon the price list, we've met the notice pleading requirements to be able to take discovery and delve into the e-mails and the internal evidence that show what the duration. . . But you're making relevant points but not in response to my question. You're contending you have a contract? Yes, Your Honor. Tell me what the terms of the contract are. And then in particular, you told me what price, you told me what products, although you haven't told me that they've offered to buy a specific product, have you? We list all the specific products. No, those are the products that they say we're making, we offer. And we accept. You said we're buying everything on your list? Yes. We accept, we're going to buy. . . Yes. We'll buy everything you offer. No, the acceptance e-mail says, and it's alleged as a fact in the pleading, that on November 2012, Mr. Voges confirms the terms of the agreement, and that's an acceptance. But tell me what. . . See, I'm still. . . We're going back and forth with each other. What are the terms of the agreement? If we order these folks tomorrow to comply with the agreement, what do they have to ship to you at what price, and are they obligated in the future to continue to do business with your client? To answer the first question, the terms of the agreement and the price point are set forth in the attachment. Right, so how many. . . We allege they exist. Right, you allege. . . See, we're missing each other here. You allege that they offered to sell you 85 products. Yes, Your Honor. And you allege that you accepted that offer. Correct. So did you agree to buy all 85 products? Yes. In what quantities? In whatever quantities were attached to the actual price list. If we were permitted to take discovery, we would know what quantities they were going to provide because the way the business worked, they would simply submit. . . We would submit purchase orders. They would send the film to us, and we would send it to the customers. So is this a one-time deal? In other words, their breach of contract was to fail to fill this specific order, but thereafter they have no obligation to provide product to your client? That's a really good question. Thank you. Yes. But the honest answer to that is it has to be in the context of the way the parties did business. No, but you are alleging a contract. I understand all the nuances that go into determining what a contract is. I want to know what contract you think you have with these folks. Must they supply your product forever? Must they only supply the product that was mentioned in these e-mails? Tell me. And in what quantities? At a minimum. At a minimum, we pled the existence of 86 products in quantities that were attached to whatever list they got in the purchase order. That's a contract. My problem with the list is it says we have this much product for each of these 85 categories. Is there some point where your client says, great, we agreed to buy that much product in each of those 85 categories? Yes, they accepted the offer. Where is that allegation, the complaint? I'm struggling with the same issues that I think are animating a lot of Judge Hurwitz's questions, which is that you are alleging not a promissory estoppel, unfair competition claims. Those claims were given up. What you are alleging is a breach of contract claims. We need to know what the terms are. And in looking at the four corners of the complaint, the best you have is that there's a longstanding course of conduct between the parties. There was a price list that was shared that listed certain products that would be made available. But then we don't know what was negotiated from that point on. Now, I take it, and correct me if I'm wrong, as I understand your argument today, the course of dealings would inform some of those questions that we're asking you today. But it's not in the four corners of a complaint. You're here on a 12b-6 appeal, dismissal on a 12b-6, right? Yes, we are. So are you able to point in the complaint where you specified the terms of the contract, other than that paragraph that indicates what Eastman is essentially offering to make available to your client? I think paragraph 32 outlines. I don't know how much more in a notice pleading requirement we can do to answer the question. Well, paragraph 32 essentially outlines what they can make available to you. That's not at all unusual. And if you look at paragraph 32? The supplier is basically contacting a potential buyer, saying that I've got the price list here. These are the products available at these prices. So that's how far paragraph 32 takes you. Now, what contract terms were negotiated after receiving that price list? And we accept the 85 products, and we accept whatever price you deliver to us in the purchase order. We will pay that price as we've been doing for 30 years. Where's that allegation? There's nothing unusual about it. Show me where that allegation is in the complaint. Well, I think the allegation as to the history of the parties doing business together is. . . No, no. I'm asking you said, and we said, we accept that. And I'm looking for the allegation in the complaint that said we accept that. The strongest place that this is accepted, I believe, we've highlighted that in November 2012, Mr. Voges confirmed the terms of the agreement. There are additional e-mails on products and pricing and a history of performance between the parties in the ordinary course of business. He accepts their offer to purchase 85 products. He accepts that on November 12th. Tell me what the allegation is. Is that because in 2000, in November of 2012? And what paragraph is that in? Yes, sir, that is page 17. That's paragraph 32, lines 9 through 12. He accepts their offer to sell 85 products. Here's my problem. If the offer is we have business, we look forward to doing business with you in the future, here's 85 products that we offer, and you then say, in conclusory terms, November 12th, Voges confirmed the terms of the agreement. I still don't know what the agreement is. What agreement are you alleging? That Plastic View agrees to purchase 85 products as it had done in the past on the terms that would be attached in a price list attached to the purchase order and that that was accepted by Mr. Voges on November 2012. Is the put-aside course of dealing in paragraph 32, is that what you think the offer is? I think that's, yes. I think that's the strongest element for the court as to a specific, I mean, I don't know how much more specific we can get than 85 products. I'm sorry, counsel. There was a 50-year relationship. Lawyers were involved on both sides for a majority of that relationship. Why didn't the parties just enter into a traditional contract? Why didn't that happen? Because of all of your argument, I've yet to hear anything about legal obligations of the parties. The way the industry works, from what I understand, as just a lawyer, not a film businessman, is there are purchase orders, invoices, e-mails, confirmation, invoices sent, acceptance, money sent, product shipped, so they weren't operating for, actually it was 50 years for the air traffic control stuff, 30 years for the film. They weren't operating with formal agreements in terms of like a supply agreement. Counsel, what businesses operate without formal agreements? This industry operates that way. That's the way they do things. There's a purchase order, an invoice, a shipment, and a sale. And they've been doing this for, the film side, for 30 years. So there's nothing unusual. In fact, this e-mail that we allege constitutes a contract is in more detail because of the context of what was going on at the time. Eastman acquired Solution. Eastman was trying to cram down a one-sided supply agreement. They were demanding our customer list. This is actually more detailed. So I want to go back to that because you allege that in your complaint. They offer you a supply agreement on terms you don't like, maybe quite properly don't like, and you say, no, we won't enter into a supply agreement. Given that, doesn't the course of conduct before that become irrelevant? I mean, they're basically saying, we'd like to change our arrangement with you. We want you to enter into a supply agreement. You say no. And then they stop doing business with you, in effect. What's wrong with that? May I answer both parts of that question? Because they're very important questions. The supply agreement that they proposed. Maybe it's terrible. Maybe it's impressive. It's actually very relevant because the supply agreement that Eastman proposed, it was the new sheriff-in-town concept. It was, hey, we want to control quality, understand that. They sent a supply agreement. It contained an 84% price increase and a demand for the customer list. I understand it was one that your clients shouldn't sign. My question is – They never sent it. That's the part. That's the part. They never sent the supply agreement until after they terminated us. But didn't they demand at an earlier point that your clients enter into a supply agreement? Your complaint alleges that. Well, our complaint alleges that they demanded that we turn over our confidential customer list. And your complaint also alleges that they demanded that, in return for a supply agreement, that you turn over your confidential customer list, right? They may have demanded it, but they never sent us the actual supply agreement until we were fired. Once they demand that you enter into a supply agreement, what's the relevance of the previous course of conduct where you had no supply agreement? I think that's – you've taken us back to your Honor's question under 2204 and 2201 of the Commercial Code. I believe that 2204 does look at the intent of the parties, and there are certain gap fillers that are provided to fill in missing terms of an agreement when you have such a long history. Obviously, they intended to do business together. They'd done it for 30 years, and they still wanted to do business. Except what I read that allegation as saying – it's your allegation – is, look, we've been doing business with you for 32 years on a handshake basis, if you will. We're not willing to do that anymore. If you want us – we want us to supply you in the future. We want a supply agreement on extortionate terms. I'll take your characterization of it. And your clients say, no, I'm not going to do that. So given that, doesn't that break the chain of all these previous years of custom? Do we then just go back and – they surely weren't willing to continue to operate the way they had in the past. They'd given you notice they weren't willing to. It could break the chain if the right hand at the executive level and the left hand – right hand and left hand were sending the same message. What Mr. Gershenson was saying was we're still in business. Here's what you're going to get. I promise you. Chris accepts. The other side is saying, well, we're really going to fire you unless you tell us who your customers are. That is not a consistent message. That brings into play prior conduct. This might be outside of the record, but can Plastic View buy this window shade and tint elsewhere? Another great question. Not – yes, but they haven't been able to duplicate the same supply. And part of the reason was it's – the relationship had been going on so long, their customers expected to get product, the same product they'd been getting for so long. So, yeah, and if they had told us – I think I've used up all my time. Counsel, just one last question for me. Do you agree that specific terms were never really nailed down? No. I disagree with the court respectfully. I believe that it doesn't get any more specific for a notice pleading requirement than paragraph 32. But you don't have any specific documentation that lays out every single time business, there was an interaction, there was an offer acceptance consideration, the meeting of the minds, and the obligations of the parties. It seems to be all over the place. And Judge Hurwitz, when he asked the question about the change of the 85 or 86 pieces or whatever you were talking about minutes ago, it's just so – it's confusing, I'll just say. If we were permitted to take discovery, I believe that there would be not only evidence of every single transaction and contract, I believe there's going to be internal evidence because these gentlemen all know each other, attend conventions together, this is outside the record. But I believe this case will move with proper discovery, not only from the contract realm, but possibly into a tort realm. So, look, before you – I believe that's – I understand that's outside of the record. We're taking you over time, but I want to make sure I understand. One argument you're making to us is that, in effect, there's an express contract to sell these 85 products. Yes. Okay. If there – are you making an argument that there's a contract beyond that? Yes. And – okay. But as to that contract beyond that, it's just to sell us however much we want at whatever prices you'll give us? No, it's the implied conduct of the parties. No, I don't want to know what you're basing it on. I want – tell me – let's assume you win this case on the contract. Tell me what the contract is that applies to everything but these 85 products. What are its terms and how long does it last? Some of that I won't know until I get into discovery. No, no, no. You have a – you're alleging you have a contract. Tell me – tell me what the contract is. It would be for Eastman to continue to supply, at a minimum, what we allege specifically, these 86 products, at least one time, as they promised. No, I asked you to assume that there was a one-time contract. Yes. Tell me what the contract you think is going forward. I think the contract going forward would be what was reasonable under the commercial code, a reasonable amount of time to continue to supply product and allow Eastman – But the problem is your answer is discovery will tell. I believe so. And that's the problem with the case because the contract terms are indefinite. That's the bottom line. I completely understand where the court's coming from. But where I disagree is because of the long history that if we're permitted to take discovery, we're going to be able to show you more than just emails about contracts. We're going to be able to show you what was really going down, which was a lot worse than a contract-based theory. We just didn't want to pursue that. You haven't pursued it. In other words, what you're saying is let us conduct discovery on a contract claim, and maybe we'll discover an antitrust claim. That's not the way it works. You have to plead a contract claim or plead an antitrust claim if you think you have one or an unfair competition. But you can't say, let us get discovery, and we may discover things that we didn't allege. The real question is, what's the contract that you allege? And I think you've been clear what contract you allege. All right. We've taken you over time. Thank you. Judge Logan, do you have any additional questions? No, I do not. Thank you. May it please the Court. I'm Daniel Sakaguchi on behalf of Defendant's Appellant's, excuse me, Appley's Eastman Chemical Company and CB Films, Inc. Good morning, Your Honors. So why hasn't your opponent at least alleged enough to get past a 12B6 motion with respect to a specific contract, a one-time contract to supply 85 products at specific prices to them? Because, Your Honor, although that is what my opponent has stated was alleged, what has been alleged falls short of even that. The allegation, the strongest allegation of any acceptance of an offer is that paragraph that he read in Paragraph 32 of the complaint, which says, Then in November 2012, vouchers confirmed the terms of the agreement. That is a conclusory allegation that does not set forth any terms that were confirmed, certainly not prices, quantities, duration, or means to sell. But as I read 32, it says, Here's a list of products that are available. We're going to have a price list later. There's a specified number of the products that are available. And he says, I confirm the terms of the agreement. It's not the greatest allegation in the world, but isn't it enough to get past 12B6 on you at least agreed to sell us these 85 products? I don't believe so. I don't believe that there is an agreement to sell 85 products. Again, what is stated is confirm the terms of the agreement. And as your Honor's questions have so astutely reached, it is impossible to tell what those terms are. Well, for this, but that's why I'm struggling for a moment. For this small contract on a continuing obligation to supply, why isn't there's a number of products, they're specified, a price list later comes out. I mean, presumably, if I can read his allegation broadly enough for him to say, Look, I'll buy them at whatever the price list is. Why isn't that a contract? It is not alleged that the price list ever came out. There is a list of 85 products in nine categories. And then there's a clarification that certain of the products sought earlier in the paragraph, if you look on page 16 of the record. We don't have some of them that you want. Not that we don't have some of them that you want, but that we will not offer you those that you want. And if I may clarify a point, what was happening at the time? PVI has purchased a private label product from Eastman on a purchase order by purchase order basis for a long time. What is happening in China and Korea is that private label product is ending up on auto glass being passed off as branded product. That is a product that Eastman sells. It's higher quality. It costs more. We have exclusive. Is that in the record? That is not in the record. Okay. So let's stick to the record. Does the record disclose why your client wanted to change its form of doing business? And I'll say it is in the record in our response in a motion to dismiss. It's not part of the pleading. Yeah, and it's also not. It's just what you're saying. Correct. This was our motivation. The complaint's a little interesting to me because it says something like, well, we were doing business for years, and then they said we're not going to supply you anymore unless you agree to these terms. Is there anything in this record that discloses why that occurred? Nothing in the record that discloses why it occurred. The price list, excuse me, the customer list is an important factor. But, again, out of respect, I won't get into what's not been placed in the record. But is there a price list in this record? There is no price list in the record. In other words, it wasn't attached to the complaint. It was not attached to the complaint. Any attachments to the complaint? I'm looking at it. I don't see any, but maybe I'm wrong. You're correct, Your Honor. Okay. I'm sorry. I'm looking at paragraph 32. I'm trying to understand what products are being offered. There's a reference to the number, but it also says, and I'm going to page 17, lines 9 and 10, I will send you a list of top-grade closeout products that we will be selling on a first-come basis in the coming weeks. Then in November, we'll just confirm the terms of the agreement. So are the products, the top-grade closeout products, the same as the 85 products referenced or these additional products? So we're trying to figure out what the terms of this one limited potential contract are. Is this yet another category of products that's referenced? From my understanding, it may be, but I have the same difficulty as Your Honors have. I don't know what is being alleged as the contract. In other words, there were certain e-mails discussing a wide range of products, some of which are identified, some of which are not, no prices given, and all we have in terms of this potential one-time contract is the conclusory allegation that the terms of the agreement were confirmed. The terms of the relevant e-mails are all in paragraph 31 and 32? As far as I can make out. I mean, at least there's no other allegation in the complaint about the e-mails? Not regarding e-mails, no. Counsel, why didn't the parties ever formalize the contract, just make sure it was a traditional contract? I know in paragraphs 31 and 32 we've heard a lot from opposing counsel about what he believes occurred under the circumstances. Why wasn't it made a little more formal? And so going back to what we were doing to police the gray market for the sale of private label goods, we have exclusive dealerships that place Lumar, the branded product, on auto glass, and we try to make sure that private label goods that can be passed off as Lumar do not end up on auto glass. As part of cleaning house in 2012, we were asking our distributors to tell us where their products were ending up on glass, in other words, to give us their customer lists. Negotiations, as I understand it, broke down with Mr. Voges at that point. Well, he alleges that. I mean, he alleges that there was an offer, but they weren't willing to do it. There was a request for a customer list, and that was a base minimum requirement of selling any private label products to any distributors, particularly those who have clientele in South Korea and China. Can we get back to what I thought was the issue in this case, and maybe it still is? Their essential allegation is you did business with us for 30 years, 50 years, some long period of time, and then you refused to. Does that course of conduct over that long period of time create some obligation at the end? You're not obligated to do business forever. Does it create some obligation about the way you cut off your customer? As I understand it, Your Honor, there being no, and particularly no means to terminate given. I'm asking as a legal matter, if you have a course of conduct of supplying someone with something, and the allegation and the complaint is you know they rely on it to do their business, can you just walk in one day and say, well, we're done? Or do you have some obligation to give a reasonable period of time in which the business relationship is terminated? I don't know the answer to that question. I don't think enough has been alleged to bind us. Your Honor, I think they're, I don't, the one place where they're really good about allegations in this case is that we had this long, long relationship, and you cut it off. Now, maybe you're entitled to. Maybe you're entitled to cut it off without any grace period in which they, but, so my question is, do those allegations state a cause of action of some sort or not? I don't believe they do. I believe we are entitled to cut it off as we did. I think we had our reasons. Those were communicated to the PVI, or excuse me, yes, PVI, during the negotiations regarding potentially signing on to a new supply agreement. Those don't appear in the complaint. However, those were our bases and our, the bases to which we're entitled to. The complaint does allege that you were willing to continue to do business. At least you told them you were willing to continue to do business on certain terms, if there were a supply agreement, if there were a large price increase, and if a customer list was given over. That was never, that agreement was never finalized, but the complaint does allege that you said that. Correct. And the reason that a course of conduct does not entitle PVI to just simply continue doing business for as long as they want is that we have our reasons for making products available to distributors or not. And if, for example, if we're policing a gray market, which is what indeed we were doing, we should be able to ask and receive information that we're entitled to that allows us to abide by our other contracts with the dealers that we have supply agreements with. Let me change the facts in this case on you just a little bit. What if you'd never made that offer to enter into a supply agreement? You just, both sides are just rolling along doing business as usual, and they put in an order to you and you say, we've decided not to sell to you anymore. Put aside whether there are unfair business and other problems, is there a breach of contract at that point? I don't understand there to be a contract at that point. There's not an implied contract to continue to supply for a reasonable time? Not that I'm aware of. Anything further to add? Nothing further to add, Your Honor. Thank you very much, both sides, for your argument in this case.
judges: Nguyen, Hurwitz, Logan